AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* ) Case No. 3:19 mj 551
IN THE MATTER OF THE SEARCH OF CELLULAR )
TELEPHONE ASSIGNED CALL NUMBER )
(937) 607-4987 )

SLO

## APPLICATION FOR A SEARCH WARRANT ~~BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS~~

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A - This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841 / 846 | distribution of controlled substance / conspiracy to distribute controlled substance |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.
☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

TFO JASON M. BARNES, DEA
Printed name and title

Sworn to before me and signed in my presence via facetime.

Date: 9-13-19

_____
Judge's signature

City and state: DAYTON, OHIO

SHARON L. OVINGTON, U.S. MAGISTRATE JUDGE
Printed name and title

## ATTACHMENT A
**Property to Be Searched**

1. The cellular telephone assigned call number **(937) 607-4987,** with listed subscriber(s) Paris House (**"Target Cell Phone"**), whose wireless service provider is Sprint, a company headquartered at 6480 Sprint Parkway, Overland Park, KS 66251.

2. Records and information associated with the **Target Cell Phone** that is within the possession, custody, or control of Sprint including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things To Be Seized

**I. Information To Be Disclosed by the Provider**

All information about the location of the **Target Cell Phone** described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the **Target Cell Phone**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (*i.e.*, antenna towers covering specific geographic areas) and "sectors" (*i.e.*, faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint, Sprint is required to disclose the Location Information to the Government. In addition, Sprint must furnish the Government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the **Target Cell Phone** on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the Government. The Government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information To Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21 U.S.C. §§ 841 and 846 involving HOUSE or other individuals.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the Government, attorney support staff, agency personnel assisting the Government in this investigation and outside technical experts under Government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER **(937) 607-4987** | Case No. **3:19 mj 551** <br><br> **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Jason M. Barnes, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this Affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **(937) 607-4987**, with listed subscriber(s) Paris House ("**Target Cell Phone**"), whose service provider is Sprint, a wireless telephone service provider headquartered at 6480 Sprint Parkway, Overland Park, KS 66251. The **Target Cell Phone** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B. A prior search warrant for information about the location of the **Target Cell Phone** was obtained on August 14, 2019 in case number 3:19-MJ-502 and was returned on September 13, 2019 following the collection of location information during the period August 19, 2019 to September 12, 2019.

2. I am a Task Force Officer ("TFO") with the U.S. Drug Enforcement Administration ("DEA"), and have been since January 2019. I have been employed in law enforcement since December 2001. I currently serve as an officer with the Dayton Police Department ("DPD"). I have been assigned to Patrol Operations and am currently assigned to the Narcotics Bureau. I have extensive prior experience in investigating drug cases that resulted in successful prosecution of persons involved in trafficking of drugs, possession of drugs, and

gun-related offenses. I have conducted narcotics-related arrests, executed search warrants that resulted in the seizure of narcotics and weapons, participated in undercover narcotics purchases, and supervised the activities of informants who have provided information and assistance resulting in narcotics purchases. Through training and experience, I am familiar with the manner in which persons involved in the illicit distribution and sales of controlled substances often operate. These subjects usually attempt to conceal their identities and the locations at which they reside, operate, or store drugs and drug proceeds.

3. Through my years of experience, I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, which is often described by traffickers as a "money phone." The money phone is used primarily to communicate with drug customers. The customers will subsequently call or send a text message to the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls or text messages from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away. I have also encountered the practice of traffickers fielding calls from drug customers and directing those customers to "drug houses" which are used to store, package, and sell narcotics.

4. The facts in this Affidavit come from my personal observations, my review of certain documents, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The

communications and conversations described in this Affidavit have been summarized, paraphrased, and/or synthesized and have not necessarily been recounted in full or verbatim.

5. Based on the facts set forth in this Affidavit, including facts learned following the issuance of the prior search warrant, there is probable cause to believe that violations of Title 21 U.S.C. §§ 841 and 846 have been committed, are being committed, and will be committed by JOVAN HOUSE (hereinafter referred to as "HOUSE")[1] utilizing the **Target Cell Phone** number of **937-607-4987**. Pursuant to an administrative subpoena, Sprint recently confirmed that the **Target Cell Phone** has a listed subscriber of Paris House and is registered to an address of 30 West Third Street, Dayton, Ohio. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

6. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

---

[1] In the affidavit for the prior search warrant, HOUSE's first name was spelled "JAVON." In reviewing information in the course of my investigation, I have seen both "Javon" and "Jovan" used in reference to HOUSE, including in materials containing HOUSE's social security number or birthdate. I believe that the actual spelling of HOUSE's first name is "Jovan," given that "Jovan" is used in his criminal history, prior records in the Montgomery County, Ohio Court of Common Pleas, and the Ohio Law Enforcement Gateway ("OHLEG") information associated with the SUBJECT VEHICLE.

## PROBABLE CAUSE

7. In April 2017, the DEA Dayton Resident Office developed information from a confidential source ("CS-1")[2] that HOUSE was distributing kilograms of heroin, fentanyl, and cocaine in the Dayton, Ohio area. CS-1 stated that HOUSE drove multiple vehicles and used multiple locations to traffic drugs, including 108 North Trenton Street in Dayton, Ohio. CS-1 also indicated that HOUSE was aware of his surroundings and watched for law enforcement. CS-1 stated that HOUSE drives numerous vehicles and is associated with multiple locations in an attempt to elude apprehension and detection by law enforcement.

8. I have researched the address of 108 North Trenton Street on the Montgomery County Real Estate Tax Information website. As of September 13, 2019, HOUSE is listed as the owner of the residence at that address. According to the website, he has been the owner since October 14, 2016.[3]

9. Beginning in April 2018, Detective Sean Humphrey of the Montgomery County Regional Agencies Narcotics & Gun Enforcement Task Force received information from another confidential source ("CS-2"), who is now deceased, that an individual named "Javon" (also known as "Huleo") was selling large amounts of fentanyl, carfentanil, heroin, marijuana, and

---

[2] The information CS-1 has provided about HOUSE has been credible and corroborated in part through independent investigation. CS-1 has been working for law enforcement for consideration in an open criminal manner.

[3] The website spells HOUSE's first name as "Javon," but the quitclaim deed for the property, which is accessible through a link on the website, spells HOUSE's first name as "Jovan" and provides a mailing address for HOUSE – 526 Leland Avenue, Dayton, Ohio 45417 – that is the same as the address listed in HOUSE's criminal history, prior records in the Montgomery County Court of Common Pleas, and the OHLEG detail for the SUBJECT VEHICLE.

crystal methamphetamine. CS-2 stated that "Javon" had a house on North Trenton Street and was staying at 3619 Charlotte Mill Drive in Moraine, Ohio.

10. On May 8, 2018, Detective Humphrey observed a black male exit the front door of the residence at 3619 Charlotte Mill Drive, enter a black 2013 Ford Escape bearing Ohio license plate HKQ1568, and leave the area. Detective Humphrey learned through OHLEG that the Ford Escape was registered to HOUSE. Based on the photo of HOUSE on OHLEG, Detective Humphrey was able to determine that HOUSE was the black male he saw exit 3619 Charlotte Mill Drive and enter the Ford Escape.

11. I have researched the black 2013 Ford Escape's license plate – namely, Ohio license plate HKQ1568 – on OHLEG. Based on this research, I have learned that the vehicle associated with that license plate is a black 2013 Ford Escape registered to HOUSE. According to OHLEG, HOUSE is still the registered owner of the black 2013 Ford Escape as of September 13, 2019.

12. In March 2019, CS-1 provided additional information about HOUSE. CS-1 stated that HOUSE currently had two cellular phone numbers: (937) 974-3664 and (937) 607-4987 (*i.e.*, the **Target Cell Phone**). In June 2019, CS-1 confirmed that HOUSE still had the same two phone numbers and further stated that HOUSE was using the residence at 1010 Angier Drive in Dayton, Ohio to traffic heroin, fentanyl, and cocaine.

13. In mid-July, 2019, CS-1 and law enforcement conducted a controlled purchase of suspected heroin/fentanyl from HOUSE at 1010 Angier Drive. The controlled purchase was arranged through a series of phone communications between CS-1 and an individual believed to be HOUSE. In the course of these communications, CS-1 spoke to HOUSE at the number for the **Target Cell Phone**. Some of the calls were made or received in my presence, and some of

the calls were recorded. During each of the calls, CS-1 recognized the voice of the individual on the **Target Cell Phone** and identified that person as HOUSE. During the course of the communications, HOUSE directed CS-1 to go to 1010 Angier Drive for the purchase.

14. In preparation for the mid-July, 2019 controlled purchase, law enforcement met with CS-1 at a neutral location, searched CS-1 and CS-1's vehicle for contraband, and provided CS-1 with recorded buy money to purchase the heroin/fentanyl from HOUSE. During the search of CS-1, no contraband was found. In addition, CS-1 was equipped with an audio recording device.

15. During the course of the operation leading to the controlled purchase on mid-July, 2019, law enforcement conducted physical surveillance of various locations, including 1010 Angier Drive and 3619 Charlotte Mill Drive. Prior to the controlled purchase, law enforcement saw HOUSE leave the residence at 3619 Charlotte Mill Drive and enter the black 2013 Ford Escape, which was parked in the driveway. Law enforcement later saw the Ford Escape pull into the driveway at 1010 Angier Drive and HOUSE emerge from the vehicle and go into the residence. Law enforcement subsequently saw CS-1 arrive at 1010 Angier Drive and go into the residence. Sometime thereafter, law enforcement saw HOUSE and CS-1 leave the residence at 1010 Angier Drive. HOUSE departed the area in the Ford Escape, and CS-1 drove off in the vehicle in which CS-1 had arrived.

16. Law enforcement followed CS-1 to the neutral location and collected a bag of suspected narcotics from CS-1. CS-1 told law enforcement that HOUSE had pulled the bag of suspected narcotics from his person and sold it to CS-1 inside the residence at 1010 Angier Drive. The bag was later submitted to the DEA North Central Laboratory for analysis and found

to contain approximately 7.2 grams of a substance containing fentanyl (Schedule II), cocaine (Schedule II), and fluoroisobutyrylfentanyl (Schedule I).

17. In early August 2019, CS-1 and law enforcement conducted another controlled purchase of suspected narcotics from HOUSE at 1010 Angier Drive. The controlled purchase was arranged through a series of phone communications between CS-1 and an individual believed to be HOUSE. In the course of these communications, CS-1 spoke to HOUSE at the number of the **Target Cell Phone**. For the purpose of these calls, CS-1 had been provided a Callyo phone and completed the calls with HOUSE while using the Callyo phone system. The Callyo phone system automatically recorded the completed calls. During each of the calls, CS-1 recognized the voice of the individual on the **Target Cell Phone** and identified that person as HOUSE. During the course of the communications, HOUSE directed CS-1 to go to 1010 Angier Drive for the purchase.

18. In preparation for the early August 2019 controlled purchase, law enforcement met with CS-1 at a neutral location, searched CS-1 and CS-1's vehicle for contraband, and provided CS-1 with recorded buy money to purchase fentanyl from HOUSE. During the search of CS-1, no contraband was found. In addition, CS-1 was equipped with an audio recording device.

19. Law enforcement also conducted physical surveillance during the early August, 2019 operation. Prior to the transaction, law enforcement observed a maroon 2002 Chevrolet Silverado bearing Ohio license plate HJY7062 sitting in the driveway at 3619 Charlotte Mill

Drive.[4] Law enforcement saw the Chevrolet Silverado pull away and identified HOUSE as the driver. At some point thereafter, law enforcement observed the Chevrolet Silverado bearing Ohio license plate HJY7062 pull into the driveway of 1010 Angier Drive. Shortly thereafter, law enforcement observed the Chevrolet Silverado depart from 1010 Angier Drive. Sometime later, law enforcement observed the Chevrolet Silverado return and saw CS-1 get into the passenger side of the Chevrolet Silverado while it was parked in the driveway of 1010 Angier Drive. Sometime prior to CS-1 getting into the Chevrolet Silverado, CS-1 had been inside the residence of 1010 Angier Drive. CS-1 was then seen exiting the Chevrolet Silverado and leaving the area.

20. Law enforcement followed CS-1 to the neutral location and collected a bag of suspected narcotics from CS-1. CS-1 told law enforcement that HOUSE had pulled the bag of suspected narcotics from his person and sold it CS-1 while CS-1 was inside the Chevrolet Silverado. The bag was later submitted to the Miami Valley Regional Crime Laboratory ("MVRCL") for analysis and found to contain approximately 27.69 grams of a substance containing fentanyl, cocaine, and fluoroisobutyrylfentanyl.

21. After the early August 2019 controlled purchase, law enforcement periodically drove past the addresses associated with HOUSE. On August 9, 2019, law enforcement drove past the residence at 3619 Charlotte Mill Drive and observed both the black 2013 Ford Escape and the Chevrolet Silverado parked in the driveway.

_____

[4] I have researched the Chevrolet Silverado's license plate – namely, Ohio license plate HJY7062 – on OHLEG. The vehicle is registered to HOUSE. As of September 13, 2019, HOUSE is still the registered owner.

22. On August 14, 2019, law enforcement obtained a warrant to collect information about the location of the **Target Cell Phone**. Law enforcement collected location information from August 19, 2019 to September 12, 2019 and returned the warrant on September 13, 2019.

23. In late August 2019, CS-1 and law enforcement conducted another controlled purchase of suspected narcotics from HOUSE at 1010 Angier Drive. The controlled purchase was arranged through a series of phone communications between CS-1 and an individual believed to be HOUSE. In the course of these communications, CS-1 spoke to HOUSE at the number of the **Target Cell Phone**. For the purpose of these calls, CS-1 had been provided a Callyo phone and completed the calls with HOUSE while using the Callyo phone system. The Callyo phone system automatically recorded the completed calls. During each of the calls, CS-1 recognized the voice of the individual on the **Target Cell Phone** and identified that person as HOUSE. During the course of the communications, HOUSE directed CS-1 to go to 1010 Angier Drive for the purchase.

24. In preparation for the late August 2019 controlled purchase, law enforcement met with CS-1 at a neutral location, searched CS-1 and CS-1's vehicle for contraband, and provided CS-1 with recorded buy money to purchase fentanyl from HOUSE. During the search of CS-1, no contraband was found. In addition, CS-1 was equipped with an audio/video recording device.[5]

25. Law enforcement also conducted physical surveillance during the late August 2019 operation. Prior to the transaction, law enforcement observed the black 2013 Ford Escape sitting in the driveway at 3619 Charlotte Mill Drive. Law Enforcement saw HOUSE leave the

---

[5] It is believed that the device was kept in CS-1's pocket during the controlled purchase.

residence at 3619 Charlotte Mill Drive and enter the Ford Escape. Law enforcement saw the Ford Escape pull away. At some point thereafter, law enforcement observed the Ford Escape pull into the driveway of 1010 Angier Drive. Law enforcement observed CS-1 get into the passenger side of the Ford Escape while it was parked in the driveway of 1010 Angier Drive. CS-1 was then seen exiting the Ford Escape and leaving the area. During the surveillance, I personally observed HOUSE exit and reenter the Ford Escape while it was parked in the driveway at 1010 Angier Drive.

26. Law enforcement followed CS-1 to the neutral location and collected a bag of suspected narcotics from CS-1. CS-1 told law enforcement that HOUSE had the bag of suspected narcotics inside the Ford Escape and sold it to CS-1 while CS-1 was inside the Ford Escape. The bag was later submitted to the MVRCL for analysis and found to contain around 56.64 grams of a substance containing fentanyl, cocaine, and fluoroisobutyrylfentanyl.

27. Law enforcement also followed HOUSE when he left 1010 Angier Drive in the Ford Escape after the late August 2019 controlled purchase. Law enforcement followed HOUSE back to 3619 Charlotte Mill Drive and observed him enter the front door to the residence.

28. After the late August 2019 controlled purchase, law enforcement periodically drove past the addresses associated with HOUSE. On September 5, 2019, law enforcement drove past the residence at 3619 Charlotte Mill Drive and observed the Ford Escape parked in the driveway.

29. I believe that collecting location information on the **Target Cell Phone** for a 30-day period will assist investigators in locating **Target Cell Phone** and help to confirm the identity of users of the **Target Cell Phone**, which is being used to commit federal narcotics offenses. Further, the information requested will potentially assist the DEA in identifying co-

conspirators, additional cellular devices owned and operated by the co-conspirators, and other locations at which evidence of drug-trafficking activity may be found.

30. In my training and experience, I have learned that Sprint is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (*i.e.*, antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (*i.e.*, faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

31. Based on my training and experience, I know that Sprint can collect E-911 Phase II data about the location of the **Target Cell Phone**, by initiating a signal to determine the location of the **Target Cell Phone** on Sprint's network or with such other reference points as may be reasonably available.

32. Based on my training and experience, I know that Sprint can collect cell-site data about the **Target Cell Phone**. Based on my training and experience, I know that for each

11

communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as Sprint typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## AUTHORIZATION REQUEST

33. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

34. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Cell Phone** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

35. I further request that the Court direct Sprint to disclose to the Government any information described in Attachment B that is within the possession, custody, or control of Sprint. I also request that the Court direct Sprint to furnish the Government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the **Target Cell Phone** on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the Government. The Government shall reasonably compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

36. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Cell Phone** outside of daytime hours.

//
//
//
//
//
//
//
//
//
//
//

37. I further request that the Court order that all papers in support of this application, including the Affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Jason M. Barnes
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on September 13, 2019.

SHARON L. OVINGTON
UNITED STATES MAGISTRATE JUDGE

14